## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | |
|---|---|
| TATANA M. TODD<br>11587 Mohican Road<br>Woodbridge, Virginia 22192<br><br>      Plaintiff,<br><br>      v.<br><br>CHRIST CHAPEL (ASSEMBLIES OF GOD)<br>13909 Smoketown Road<br>Woodbridge, Virginia 22192<br><br>Serve: H. Robert Showers<br>       Simms Showers LLP<br>       305 Harrison St. SE, 3rd Floor<br>       Leesburg, Virginia 20175<br><br>      and<br><br>JONATHAN GRAY<br>18890 Leaf Covered Court<br>Triangle, Virginia 22172<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:12cv 1194
AJT/JFA

## COMPLAINT

COMES NOW THE PLAINTIFF, TATANA M. TODD, by counsel, and moves this

Court for entry of judgment in her favor, and against the Defendants, CHRIST CHAPEL

(ASSEMBLIES OF GOD) and JONATHAN GRAY, and in support of such complaint alleges

and avers as follows:

### NATURE OF ACTION

1.     This action sets forth claims under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e, *et seq*, arising from Plaintiff's former employment with Christ

Chapel (Assemblies of God) ("Christ Chapel") for hostile work environment on the basis of gender, wrongful discharge on the basis of gender, and retaliation. In addition, there are common law claims for negligent hire, negligent retention, battery and breach of fiduciary duty.

## PARTIES

2.      Plaintiff Tatana M. Todd ("Ms. Todd") is a resident and citizen of Prince William County in the Commonwealth of Virginia.

3.      Defendant Christ Chapel is a church located in Prince William County in the Commonwealth of Virginia.

4.      At all times relevant to this case, Ms. Todd was an "employee" of Christ Chapel within the meaning of 42 U.S.C. § 2000e(f).

5.      At all times relevant to this case, Christ Chapel is an "employer," and was Ms. Todd's employer, within the meaning of 42 U.S.C. § 2000e(b).

6.      Defendant Jonathan Gray is a resident and citizen of Prince William County in the Commonwealth of Virginia.

7.      At all times relevant to this case, Mr. Gray was employed by Christ Chapel.

## JURISDICTION

8.      Ms. Todd filed timely complaints against Christ Chapel with the Equal Employment Opportunity Commission ("EEOC") and with the Prince William County Human Rights Commission.

9.      On July 24, 2012, the Prince William County Human Rights Commission issued a letter dismissing Ms. Todd's Charge filed with the Human Rights Commission. It did not issue a right to sue notice.

2

10.     Despite requests, the EEOC to date has not issued a right to sue notice.  However, more than 180 days have elapsed since the filing of Ms. Todd's charge with the EEOC, with no formal action taken by the EEOC.  Accordingly, Ms. Todd has exhausted her administrative remedies in this matter.

11.     This Court has subject matter jurisdiction over Ms. Todd's claims under 28 U.S.C. §§ 1331 & 1343(4), and 42 U.S.C. § 2000e-5(f)(3).

12.     This Court has jurisdiction over Ms. Todd's state law claims under 28 U.S.C. § 1367 as these claims are so related to the Title VII claims that they form part of the same case or controversy.

13.     The causes of action alleged in this action all arose within the Eastern District of Virginia.

14.     Defendants are subject to personal jurisdiction under Va. Code § 8.01-328.1 (A)(1), (2), & (3).

## VENUE

15.     The unlawful employment practices alleged in this Complaint all occurred within the Eastern District of Virginia.

16.     Ms. Todd would still be employed in the Eastern District of Virginia but for the unlawful employment practices alleged in this Complaint.

17.     The employment records at issue are located within the Eastern District of Virginia.

18.     All of the relevant and material events in this case occurred in the Eastern District of Virginia.

19.     Venue lies in this judicial district under 28 U.S.C. § 1391(b) and 42 U.S.C.

§ 2000e-5(f)(3).

## FACTS

20.    Ms. Todd began working as a fifth grade teacher at Christ Chapel's Christ Chapel Academy ("school") in August 2002.

21.    Ms. Todd performed many duties during her employment with Christ Chapel, including teaching classes, mentoring new teachers, administering homework help to students, coaching the step and dance teams, teaching private violin lessons, and leading the Speech Club.

22.    Ms. Todd was not a minister of Christ Chapel or a part of its clergy.

23.    Christ Chapel did not consider Ms. Todd to be one of its ministers or a part of its clergy.

24.    Christ Chapel did not ordain, commission, or license Ms. Todd to be a minister or pastor.

25.    Christ Chapel did not give Ms. Todd the title of minister or pastor.

26.    Christ Chapel did not hold Ms. Todd out to the congregation as one of its ministers or pastors.

27.    Christ Chapel did not hold Ms. Todd out to the public as one of its ministers or pastors.

28.    To be a teacher at Christ Chapel's school, Ms. Todd did not have to undergo any religious training or instruction concerning any church doctrine.

29.    To be a teacher at Christ Chapel's school, Ms. Todd did not have to satisfy any academic requirements regarding religious training, instruction, or church doctrine.

30.    To be a teacher at Christ Chapel's school, Ms. Todd did not have to take any examinations concerning religious training, instruction, or church doctrine.

4

31.     To be a teacher at Christ Chapel's school, Ms. Todd did not have to obtain any diplomas, certifications, or licenses regarding religious instruction or church doctrine.

32.     To be a teacher at Christ Chapel's school, Ms. Todd was only required to have a bachelor's degree in any secular subject.

33.     To be a teacher at Christ Chapel's school, one did not have to join or be a member of the church or its congregation.

34.     To be a teacher at Christ Chapel's school, Ms. Todd did not have to undergo any process of commissioning, ordination, or ministry or pastoral licensure.

35.     The terms and conditions of Ms. Todd's employment were governed by annual contracts with Christ Chapel's school, and not by Christ Chapel's congregation.

36.     As a teacher at Christ Chapel's school, Ms. Todd did not teach, was not qualified or credentialed to teach, and was specifically instructed not to teach, the religious doctrine or tenets of any church.

37.     More specifically, Christ Chapel adheres to 16 religious doctrines known as the "Statement of Fundamental Truths." As a teacher at Christ Chapel's school, Ms. Todd, as well as the other teachers at the school, was not expected or authorized by the church to teach or spread the faith of any of these doctrines to students, and was specifically instructed by the church to avoid teaching or spreading the faith of any of these doctrines to students.

38.     Moreover, as a teacher at Christ Chapel's school, Ms. Todd was specifically instructed to avoid discussion of any topic of a religious or theological nature that tended to divide evangelical believers, and was further instructed to refer such topics to a student's local church or minister.

5

39.    As a teacher at Christ Chapel's school, it was not part of Ms. Todd's duties to teach the doctrine or tenets of any church to students.

40.    Jonathan Gray ("Mr. Gray") was a pastor, counselor, and supervisor employed by the church during the time of Ms. Todd's employment with Christ Chapel. When Ms. Todd coached the step team, Mr. Gray was her direct supervisor in the youth ministry. She and her husband, Matthew Todd ("Mr. Todd") were also placed under Mr. Gray's authority in the youth ministry.

41.    In August 2010, Mr. Gray began making unwanted sexual comments to and about Ms. Todd. While they were attending the National Fine Arts Festival in Detroit as chaperones for student groups, Mr. Gray began shouting cat-calls at Ms. Todd, talking about how "fine" she looked and about the way she walked. Mr. Gray made these comments in front of students and other youth leaders.

42.    Ms. Todd was shocked that Mr. Gray would make these comments to her, and was grateful when another youth leader spoke up to say, "I'm certain that her husband thinks the same thing."

43.    Mr. Gray also sent Ms. Todd complimentary and flirtatious text messages such as, "has anyone told you how amazing you are today?" and "I think you're incredible." Ms. Todd was cautious in her responses, since she did not want to seem as if she was encouraging Mr. Gray's flirting.

44.    During a concert on the trip, Ms. Todd started to sit down in a seat next to one that Mr. Gray had just taken. Ms Todd said, "I didn't take your seat did I?  I just want to make sure I was in the right place." Mr. Gray grinned at her, rubbed the back of the seat, and said,

"Oh, yes, you're definitely in the right place." Ms. Todd was made uncomfortable by this comment and moved to a seat farther away from Mr. Gray.

45.      After returning from this trip, Mr. Gray and Ms. Todd began spending more time together while working on an event for the step team that Ms. Todd was coaching, and they developed a closer friendship.

46.      Ms. Todd was experiencing increased stress at home and at work due to her increased personal and professional responsibilities, her husband's new job, and her child's behavioral problems and difficulties with school.  She was having trouble balancing all of these issues, so she sought out Mr. Gray and his wife to help counsel her.  Ms. Todd was reluctant to seek counseling for these issues but decided that she would feel comfortable with Mr. Gray since he was a pastor, counselor, work supervisor, and friend of the family.  Ms. Todd therefore began to seek guidance from Mr. Gray and Ms. Gray on balancing the many personal and professional issues she was facing.  Ms. Gray typically did not have time to talk to Ms. Todd, but Mr. Gray frequently made himself available to counsel Ms. Todd.

47.      Ms. Todd visited Mr. Gray daily to share her personal and professional problems with him and to seek pastoral counseling from him about these issues.

48.      As Ms. Todd shared more of her personal feelings with Mr. Gray, Mr. Gray began taking advantage of his knowledge of Ms. Todd's emotional vulnerabilities and started touching Ms. Todd.  He used his position of power and trust, and the personal information that Ms. Todd had confided in him, to manipulate her and take advantage of her sexually.

49.      Mr. Gray started sending more romantic, flirty text messages to Ms. Todd, telling her that she was smart and sexy.  Mr. Gray knew that Ms. Todd felt a need to feel cared for and desired, so he flattered and emotionally manipulated her.

7

50.     When Ms. Todd met with Mr. Gray for their pastoral counseling sessions, he suggested solutions to Ms. Todd's problems in which he played a role, such as telling her how he would help her relieve her stress if they were in a relationship. He began to talk to Ms. Todd about what he would do to make her happy and solve her problems if he were her husband.

51.     Mr. Gray shared his marital problems with Ms. Todd and compared her with his wife, making comments such as, "Where were you when I was looking?" – i.e., when he was looking for a wife, and "You wouldn't treat me like this, would you?" (when telling Ms. Todd about an interaction with his wife). Mr. Gray began fantasizing to Ms. Todd about leaving their spouses, making comments such as, "What if no one would get hurt, would you run away with me?" and "What if we would switch rings?"

52.     Mr. Gray also compared himself to Ms. Todd's husband, telling her that she needed a "big man" and that while her husband was too small to "take care of" her, he was the perfect size.

53.     Mr. Gray then began kissing Ms. Todd and touching her sexually. Ms. Todd was vulnerable and confused.

54.     During youth choir rehearsals and before and after step team practices, Mr. Gray and Ms. Todd would often meet in his office. Mr. Gray would counsel Ms. Todd on any personal or professional issues she was facing, and then he would kiss her and touch her chest, back, and bottom.

55.     One time when Mr. Gray and Ms. Todd were meeting in his office, he started telling Ms. Todd what he wanted to do to please her sexually and he said that he was going to perform those acts then and there. Ms. Todd told him no, and his response was to pull down her pants and say, "I will lean you over this desk and take care of you right here." Ms. Todd was

shocked and scared, and was grateful to be interrupted by Mr. Gray's daughter knocking on his office door.

56.    Mr. Gray also visited Ms. Todd in her classroom and touched her sexually there. He would watch her classroom to see when she was alone there and would visit her then. He would walk into her classroom, grab her, and kiss her.

57.    He also stopped by her classroom during the day when students were in the room. He visited Ms. Todd so much that her students began commenting about "that pastor" who kept stopping by.

58.    Mr. Gray would insist on spending Ms. Todd's entire lunch time with her in her classroom, even telling her friends to leave the room and keeping students from being able to visit Ms. Todd during lunch. Mr. Gray made Ms. Todd more and more dependent on him and his counseling and started isolating her from her other friends.

59.    Mr. Gray expressed jealousy over Ms. Todd's relationship with her husband. One time, Ms. Todd tried Mr. Gray's advice about a specific situation with her husband and found that it worked. When she told Mr. Gray that his advice had helped her connect with her husband better and that they had been intimate the night before, Mr. Gray became upset, saying, "Now you don't need me anymore."

60.    Ms. Todd tried to convince Mr. Gray to stop touching her. However, whenever she told Mr. Gray that she was ending their counseling, Mr. Gray manipulated and pressured her into continuing a relationship with him. He would come to her crying about how much he missed her and try to convince her to continue their counseling sessions. He would tell her that they were doing nothing wrong and were not cheating on their spouses, and that he looked on Ms. Todd's husband as a brother and would never do anything that would hurt him. Mr. Gray

would promise not to touch her anymore if she would just continue to have conversations with him, saying that he liked being able to have intellectual conversations with her. Each time, Mr. Gray manipulated Ms. Todd into continuing to talk to him, but then he would begin touching her again.

61.    On October 25, 2010, Mr. Gray persuaded Ms. Todd to meet him to continue pastoral counseling in a location near Christ Chapel. When she got there, Mr. Gray had sex with her in the back of his car. Mr. Gray was aware of how vulnerable and confused Ms. Todd was.

62.    Ms. Todd felt extremely ashamed and violated while and after having sex with Mr. Gray.

63.    Mr. Gray manipulated Ms. Todd emotionally and used his position as a trusted pastor and counselor with knowledge of her personal feelings to take advantage of her sexually. Due to his position as her counselor and pastor, Mr. Gray's sexual actions with Ms. Todd were not consensual.

64.    The next morning, Ms. Todd met with Mr. Gray. She told him that she had been unable to be intimate with her husband the night before because she had felt so ashamed of what she had done with Mr. Gray. Mr. Gray told her that she needed to continue to be intimate with her husband as he continued to be intimate with his wife. Mr. Gray began to tell Ms. Todd that having sex with his wife could not compare to having sex with her, and Ms. Todd forcefully told him to stop making comments like that.

65.    A few days later, Ms. Todd realized that she had not started her menstrual cycle when she should have, so she took an over-the-counter pregnancy test. The test result was negative, and she shared the results with her husband.

66.    That afternoon, she also spoke to Mr. Gray to tell him that her period was late but that the pregnancy test showed a negative result. Mr. Gray told her that he did not think that he could father a baby because he had had a vasectomy. Ms. Todd told him that her husband had had the same procedure performed on him, but that he nevertheless still had a sperm count, so it could be possible for Mr. Gray to father a child. Mr. Gray then became visibly irritated.

67.    Ms. Todd made an appointment to meet with Mr. Gray for counseling a few days later. Mr. Gray was upset that Ms. Todd had made an appointment with him on a day when she knew she should be on her period. Mr. Gray told her, "Why did you want to see me if you knew you were going to get your period?", clearly indicating that his primary focus was continuing his sexual abuse of Ms. Todd, not helping to counsel her.

68.    Mr. Gray then told Ms. Todd that if she was pregnant and the baby was his, he would be supportive of her and the baby. He also asked Ms. Todd to alert him when her period began.

69.    Around this time, Ms. Todd's husband began to question Ms. Todd about the nature of her close relationship with Mr. Gray. Eventually, Ms. Todd confessed that she had a relationship with Mr. Gray, but she did not divulge that they had intercourse. Ms. Todd was so upset by Mr. Gray having taken advantage of her that she had blocked the intercourse from her mind and initially remembered only that he had rubbed his penis on her.

70.    The next day, Ms. Todd contacted Mr. Gray to end their relationship. Mr. Todd also contacted Mr. Gray and told him to have no further contact with Ms. Todd and to tell both Rev. Bill Roberts ("Rev. Roberts"), the leader of Christ Chapel, and Ms. Gray, about his relationship with Ms. Todd.

11

71.     Mr. Gray told Ms. Todd that he would be forced to resign from Christ Chapel if he admitted what he had done with Ms. Todd. He also said that his wife would not forgive him and that he would be forced to find a new place to live. He reminded Ms. Todd that both his wife and Rev. Roberts were aware that he had had an inappropriate sexual relationship with another woman in Christ Chapel's care ministry a few years previously. He said that they would not forgive him for having another affair, and that he would likely lose his job and his wife as a result. Mr. Gray appeared to be trying to scare Ms. Todd about the negative consequences that he would face if anyone else found out about his relationship with Ms. Todd.

72.     On November 5, 2010, Ms. and Mr. Todd met with Dr. Vince McLaughlin ("Dr. McLaughlin"), the Dean of the College, for spiritual and marital guidance and to report what had happened between Mr. Gray and Ms. Todd.

73.     Later that day, Ms. and Mr. Todd also told Paul Miklich ("Mr. Miklich"), the Administrator of the Academy, about her relationship with Mr. Gray. They had realized that this relationship might be grounds for Ms. Todd to be terminated, and wished to report it to Mr. Miklich right away so he would hear about it directly from Ms. Todd and not from a different source.

74.     On November 7, 2010, Mr. Miklich met with Ms. and Mr. Todd. He told them that he would arrange for them to meet with Rev. Roberts and that he would also contact Mr. Gray to give him notice to make arrangements with his employer and his family.

75.     At this time, Ms. and Mr. Todd told Mr. Miklich that Ms. Todd and Mr. Gray had not had intercourse, because Ms. Todd still did not remember that intercourse had occurred.

76.     Mr. Todd continued to ask Mr. Gray to report his relationship to his wife, but Mr. Gray continued to delay and asked Mr. Todd not to tell her. He made several promises that he

would tell his wife soon, but then said that he wanted to wait a couple of weeks so he could make financial arrangements first.

77.     After Mr. Miklich notified Mr. Gray that he had been informed of Mr. Gray's relationship with Ms. Todd, Mr. Gray called Mr. Todd in anger to complain that his supervisors had learned that he was the pastor who had had an inappropriate relationship with Ms. Todd.

78.     A few days later, Rev. Roberts called Mr. Todd to talk about Ms. Todd's relationship with Mr. Gray.  Rev. Roberts asked Mr. Todd questions about who else had been told, and he told Mr. Todd to keep the issue quiet and not to tell anyone outside his family about what had happened.

79.     During the conversation, Rev. Roberts stated to Mr. Todd, "This should never have happened.  I mean it, this should have never happened.  I hope you understand what I'm saying."  Mr. Todd interpreted these comments as an admission of Christ Chapel's role in allowing Mr. Gray's sexual abuse.

80.     Ms. and Mr. Todd later met with Rev. Roberts together.  Rev. Roberts asked both of them to step down from their leadership positions with Christ Chapel for the immediate future, but told them that they were free to continue participating in church and school activities as any other congregant or parent could.

81.     Ms. Todd then met with Debbie Wolf, the school principal, and Mr. Miklich, to discuss her position with Christ Chapel.  Mr. Miklich told her that he was placing her on administrative leave with pay, although she would still be expected to provide lesson plans to support her substitute teacher.

82.     Mr. Miklich assured Ms. Todd that she and her husband would receive the same treatment from Christ Chapel as Mr. and Ms. Gray.  He told her that Christ Chapel would pay for

counseling for her and her husband to work through these issues, just as they were doing for Mr. and Ms. Gray.

83.    Mr. Miklich told Ms. Todd that she had until December 3, 2010 to decide whether to resign her position, take a sabbatical, or allow the School Board to decide the future of her employment with Christ Chapel. He suggested that she try taking a sabbatical for a year, but said that the decision was ultimately hers to make.

84.    After Christ Chapel learned of Ms. Todd's relationship with Mr. Gray, Mr. and Ms. Todd had to step down from their positions within the church. Christ Chapel also excluded Ms. and Mr. Todd from participating in church and/or school activities with other parents. Ms. Gray told Mr. Todd that he and his wife were banned from attending or assisting with any church youth events, including events in which their children were involved.

85.    Mr. and Ms. Gray, however, were still allowed to be involved in Christ Chapel programs.

86.    Christ Chapel eventually forced Mr. Gray to resign because of his inappropriate relationship with Ms. Todd, but allowed him to remain involved in church programs.

87.    Greg Citizen ("Mr. Citizen"), a church elder, head of Human Resources at Christ Chapel, and Chairman of the Academy's School Board, told Mr. Todd that he never mentioned Ms. Todd's name in his disclosure to church staff that Mr. Gray was resigning. However, it soon became apparent that Christ Chapel had divulged Ms. Todd's name in this announcement, since on the day the announcement was made, 45 members of Christ Chapel unfriended and blocked Ms. Todd on Facebook and stopped speaking to her.

88.    Christ Chapel's attempts to shame Ms. Todd after she was sexually abused by Mr. Gray created great stress for Ms. Todd and her family.

14

89.     However, as Ms. Todd received counseling and started to become emotionally stronger, she remembered that she had had intercourse with Mr. Gray and she told her husband about it.  Mr. Todd immediately told Rev. Roberts the extent of Mr. Gray's sexual relationship with Ms. Todd.

90.     In early December, Ms. Todd discovered that she was pregnant.  Ms. Todd realized that she still had not gotten her period, so she took several additional pregnancy tests, which returned a positive result.

91.     Over the next few weeks, Mr. Miklich treated Ms. Todd in a very hostile manner, speaking to her harshly and repeatedly calling her to try to force her to resign.  He told her that if she resigned, she would have a clean record and no one else would ever find out what happened between her and Mr. Gray, but that if she did not resign, she would be terminated and her chances for future employment would be harmed.

92.     Ms. Todd was frequently in tears over the amount of pressure Mr. Miklich was placing on her to resign.

93.     During her administrative leave, Ms. Todd received numerous emails from parents of her students saying that they were frustrated that students' grades were not being updated.  Ms. Todd realized that her substitute was not able to update the students' grades, so Ms. Todd updated them herself and told Ms. Wolf that she had done so.

94.     Mr. Miklich then emailed Ms. Todd to tell her that she had violated their agreement for her administrative leave by updating grades herself.  He stated his intention to notify the School Board that they may need to dismiss Ms. Todd for this reason.

95.     Mr. Miklich then changed Ms. Todd's email password without notifying her, leaving her unable to access her work email or files.

15

96.     Ms. Todd requested more information from Mr. Miklich about her options for her employment with Christ Chapel, including more information about the possibility of going on sabbatical for a year, as Mr. Miklich had suggested. Mr. Miklich told her that he could not authorize a sabbatical and could only request one from the School Board, but would not give Ms. Todd any further information about this topic and made it clear that the only options he was giving her were to resign or face likely termination by the School Board.

97.     During this time, Ms. Todd suffered numerous pregnancy complications that were caused by the stress placed upon her by Christ Chapel. Ms. Todd had frequent stress-induced vaginal bleeding, had to be on bed rest, and was hospitalized for pre-term labor. These physical complications added to the emotional stress that Christ Chapel created for Ms. Todd.

98.     Rev. Roberts, Mr. Miklich, and Mr. Citizen repeatedly claimed that Ms. Todd had had a consensual sexual relationship with Mr. Gray. However, as Ms. Todd received counseling, became emotionally stronger, and read professional literature on sexual abuse, she realized, through the help of her counselors, that her relationship with Mr. Gray had not involved her consent, since he was a counselor, pastor, and authority figure who had used his power over her to take advantage of her vulnerable state.

99.     Ms. Todd decided to refuse to resign and to fight to retain her job. She sent a letter to the School Board explaining that she had not consented to a relationship with Mr. Gray and that he had abused his power and used his knowledge of her emotional vulnerabilities to manipulate and take advantage of her.

100.    Before the date when Ms. Todd was required to decide whether or not to resign, Mr. Miklich called her and told her not to return to work in December, even after the date on which she was required to decide whether or not to resign.

16

101.    Mr. Miklich told Ms. Todd that she would receive a detailed letter explaining the School Board's decision on December 13, 2010.

102.    On December 13, 2010, the School Board notified Ms. Todd by email that she was being terminated from Christ Chapel. She was offered a salary, tuition assistance for the rest of the school year, and continued counseling.

103.    Mr. Miklich told Mr. Todd that he had already decided to terminate Ms. Todd's employment before the School Board met to discuss the matter. This violated Ms. Todd's employment contract with Christ Chapel, which stated that the School Board had to make the decision whether or not to terminate her employment.

104.    On December 14, 2010, Ms. Todd asked Mr. Miklich for a copy of the promised letter outlining the School Board's decision to terminate her. Mr. Miklich said that he still needed to make some minor changes to the letter before sending it to her. Mr. Miklich told Ms. Todd that she could still resign to prevent a blemish on her employment record, and that "none of this has to happen."

105.    On December 16, 2010, Ms. Todd received her termination letter. In the letter, which was signed by Mr. Citizen, the School Board attacked Ms. Todd's character and stated that she should have known better than to get involved in a relationship like the one that occurred. The letter also claimed that Ms. Todd had "agreed" with Mr. Miklich that she had consented to a relationship with Mr. Gray and that she was only claiming that the relationship was abusive to attempt to retain her job. This assertion was completely false, as Ms. Todd had never stated that she had consented to a sexual relationship with Mr. Gray.

17

106.    The School Board gave Ms. Todd only 24 hours to appeal their decision to terminate her, despite her employment contract's requirement that she be given a full week to do so.

107.    After Ms. Todd received her termination letter, Mr. Miklich called her and asked to be reimbursed for a counseling session that had included both Mr. and Ms. Todd. He stated that Christ Chapel would not pay for counseling sessions involving Mr. Todd, despite their previous promise to do so. Mr. Miklich also told Ms. Todd that he would be cutting her pay.

108.    Ms. Todd reminded Mr. Miklich that Mr. and Ms. Gray were both receiving Christ Chapel-funded counseling and that Mr. Miklich had promised that Mr. and Ms. Todd would receive equal treatment. Mr. Miklich responded that Ms. Todd would need to sign a separation agreement in order to receive that benefit. Their conversation became very heated.

109.    Mr. Todd requested a meeting with Rev. Roberts to discuss the Todds' frustrations about the handling of this matter. Mr. Miklich and Mr. Citizen also attended this meeting, which occurred on December 21, 2010.

110.    Mr. Todd told Mr. Miklich and Mr. Citizen the full extent of Mr. Gray's sexual abuse of his wife and explained that the relationship could not be considered consensual, since Ms. Todd had gone to Mr. Gray for counseling. Rev. Roberts responded by aggressively leaning toward Mr. Todd and claiming that Christ Chapel had no record of Ms. Todd asking to be assigned to a pastor for counseling. Mr. Todd was too intimidated to correct Rev. Roberts.

111.    Rev. Roberts, Mr. Miklich, and Mr. Citizen attempted to dismiss Mr. Gray's sexual conduct with Ms. Todd, referring to it as just "four minutes of childish foreplay."

112.    Mr. Todd explained the extent of the sexual acts that had occurred between Mr. Gray and Ms. Todd. He emphasized that these acts were not consensual and that Christ Chapel

18

could have prevented them from happening, since the church was aware that Mr. Gray had sexually abused women in the past. Rev. Roberts argued forcefully with Mr. Todd that the acts were consensual, even going so far as to yell at Mr. Todd.

113. Rev. Roberts, Mr. Miklich, and Mr. Citizen were very combative throughout the meeting, frequently arguing with Mr. Todd and speaking aggressively.

114. Eventually, Mr. Todd and the Christ Chapel leadership reached an agreement that Ms. Todd would receive the remainder of her salary for that calendar year and counseling for herself and her husband.

115. At the end of the meeting, Mr. Todd asked to speak to Rev. Roberts privately. He told Rev. Roberts that Ms. Todd was pregnant and that the baby could be Mr. Gray's.

116. Rev. Roberts asked Mr. Todd who else knew about Ms. Todd's pregnancy, and Mr. Todd said that no one else knew. Rev. Roberts then instructed Mr. Todd to ensure that Ms. Todd hid her pregnancy for as long as possible. He said that Ms. Todd should wear large clothes to hide her pregnancy and not tell anyone else about it.

117. After additional pressure from Christ Chapel, Ms. Todd reluctantly agreed that she would resign from Christ Chapel.

118. Throughout these events, Christ Chapel treated Ms. Todd much differently than they treated Mr. Gray. Mr. Gray received support and counseling from Christ Chapel, while Ms. Todd did not after she refused to sign a separation agreement. Mr. Gray was allowed to still have some involvement with church programs, while Ms. Todd was banned from doing so. Mr. Gray remains a leader in the church ministry. He is also participating in a program that will allow him to return to working in his field in two years, while Ms. Todd has lost her job.

119. Christ Chapel was aware that Mr. Gray had previously sexually abused at least one other woman at Christ Chapel.

120. Christ Chapel allowed Mr. Gray to remain employed at Christ Chapel and therefore gave him the opportunity to abuse additional women, like Ms. Todd.

121. Christ Chapel has a history of allowing male church employees who have sexually abused female employees to remain working at Christ Chapel.

122. Christ Chapel also has a history of disparate treatment of the victims and the perpetrators of sexual abuse at the church, giving additional authority to employees who sexually abused women and terminating and attempting to silence women who have been sexually abused, such as Ms. Todd.

**COUNT ONE –**

**HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII**
**(against Christ Chapel (Assemblies of God))**

123. The allegations of the foregoing paragraphs are incorporated as if realleged herein.

124. Christ Chapel, through its employees, agents, and managers, harassed Ms. Todd on account of her sex during the course of her employment with Christ Chapel.

125. Christ Chapel discriminated against Ms. Todd and subjected Ms. Todd to a hostile work environment on the basis of her gender, female.

126. The harassment Ms. Todd experienced in Christ Chapel's workplace adversely affected the terms, conditions, and privileges of her employment at Christ Chapel, in violation of Title VII of the Civil Rights Act of 1964, as amended. See 42 U.S.C. § 2000e-2(a)(1).

127. Ms. Todd brought the hostile work environment to the attention of Christ Chapel, specifically Rev. Roberts, Mr. Miklich, and Mr. Citizen.

128.    Christ Chapel failed to take adequate measures to eliminate the hostile work environment that was brought to their attention.

129.    As a direct and proximate result of the hostile work environment, Ms. Todd has suffered damages, including past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, physical and emotional stress, pain, suffering, inconvenience, mental anguish, medical expenses, embarrassment, and humiliation.

130.    Christ Chapel created, maintained, and failed to correct the hostile work environment described above with malice and reckless indifference to the federally protected rights of Ms. Todd.  See Section 109(b) of the Civil Rights Act of 1991.  Ms. Todd is entitled to punitive damages.

**COUNT TWO –**

**WRONGFUL AND CONSTRUCTIVE DISCHARGE ON THE BASIS OF GENDER**
**(against Christ Chapel (Assemblies of God))**

131.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

132.    Christ Chapel's actions in forcing Ms. Todd to resign after learning that she had been sexually abused by Mr. Gray constituted a violation of Title VII of the Civil Rights Act of 1964, as amended.  See 42 U.S.C. § 2000e-2(a)(1).

133.    As a direct and proximate result of Christ Chapel's actions, Ms. Todd has suffered damages, including past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, physical and emotional stress, pain, suffering, inconvenience, mental anguish, medical expenses, embarrassment, and humiliation.

134.    Christ Chapel carried out the constructive discharge described above with malice and reckless indifference to the federally protected rights of Ms. Todd.  See Section 109(b) of the Civil Rights Act of 1991.  Ms. Todd is entitled to punitive damages.

## COUNT THREE –

### RETALIATION IN VIOLATION OF TITLE VII
**(against Christ Chapel (Assemblies of God))**

135.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

136.    In addition to retaliation over complaints of a hostile work environment (as described above), Christ Chapel retaliated against Ms. Todd because of her sex (female) in violation of Title VII of the Civil Rights Act of 1964, as amended. See 42 U.S.C § 2000e-2(a)(1).

137.    As a direct and proximate result of the unlawful retaliation, Ms. Todd has suffered damages, including past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, physical and emotional stress, pain, suffering, inconvenience, mental anguish, medical expenses, embarrassment, and humiliation.

138.    Christ Chapel carried out the unlawful retaliation described above with malice and with reckless indifference to the federally protected rights of Ms. Todd.  See Section 109(b) of the Civil Rights Act of 1991.

## COUNT FOUR –

### NEGLIGENT HIRE
**(against Christ Chapel (Assemblies of God))**

22

139.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

140.    Christ Chapel had a duty to its employees, including Ms. Todd, not to hire employees whom they knew or should have known were dangerous and likely to harm their employees.

141.    Christ Chapel had actual and/or constructive knowledge that Mr. Gray had previously sexually abused women and/or was likely to harm his fellow employees.

142.    Had Christ Chapel not hired Mr. Gray, he would not have had the opportunity to sexually abuse Ms. Todd.

143.    Christ Chapel's negligence was a proximate cause of Mr. Gray's sexual abuse of Ms. Todd.

144.    Christ Chapel's hiring of Mr. Gray in the face of knowledge of Mr. Gray's sexually abusing women constituted gross negligence and evinced a conscious disregard for the rights of Ms. Todd.   Ms. Todd is entitled to punitive damages.

145.    As a direct and proximate result of Christ Chapel's actions, Ms. Todd has suffered damages, including past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, physical and emotional stress, pain, suffering, inconvenience, mental anguish, medical expenses, embarrassment, and humiliation.

### COUNT FIVE –

### NEGLIGENT RETENTION
### (against Christ Chapel (Assemblies of God))

146.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

147.    Christ Chapel had a duty to its employees, including Ms. Todd, not to retain employees whom they knew or should have known were dangerous and likely to harm their employees.

148.    Christ Chapel had actual and/or constructive knowledge that Mr. Gray was sexually abusing women and was likely to harm his fellow employees.

149.    Christ Chapel was negligent in retaining Mr. Gray after they learned, or should have learned, that he was sexually abusing female employees.

150.    Had Christ Chapel properly removed Mr. Gray from the workplace, he would not have had the opportunity to sexually abuse Ms. Todd.

151.    Christ Chapel's negligence was a proximate cause of Mr. Gray's sexual abuse of Ms. Todd.

152.    Christ Chapel's retention of Mr. Gray in the face of knowledge of Mr. Gray's history of sexually abusing women including, specifically, Ms. Todd, constituted gross negligence and evinced a conscious disregard for the rights of Ms. Todd.  Ms. Todd is entitled to punitive damages.

153.    As a direct and proximate result of Christ Chapel's actions, Ms. Todd has suffered damages, including past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, physical and emotional stress, pain, suffering, inconvenience, mental anguish, medical expenses, embarrassment, and humiliation.

24

## COUNT SIX –

### BATTERY
### (against Jonathan Gray and Christ Chapel (Assemblies of God))

154.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

155.    As described above, Mr. Gray had sex with Ms. Todd without her consent. This action by Mr. Gray constituted unwanted physical and bodily touching of Ms. Todd's person.

156.    Mr. Gray's physical and bodily touching of Ms. Todd was uninvited, unwanted, and not consented to by Ms. Todd.

157.    Mr. Gray's conduct constituted a battery on Ms. Todd.

158.    Mr. Gray acted with actual malice towards Ms. Todd and under circumstances that amount to a willful and wanton disregard of her rights.

159.    Mr. Gray battered Ms. Todd during the course of performing his duties as a counseling pastor with Christ Chapel and in the course of counseling Ms. Todd who turned to Mr. Gray for pastoral counseling.

160.    Mr. Gray battered Ms. Todd during the course of executing the services for which he was employed by Christ Chapel and in the course of executing the service of providing Ms. Todd with pastoral counseling.

161.    Mr. Gray was acting within the scope of employment at the time he battered Ms. Todd.

162.    Christ Chapel is responsible and liable for Mr. Gray's battering of Ms. Todd under the doctrine of respondeat superior.

163.    Moreover, Christ Chapel gave Mr. Gray implied authority to engage in this conduct. Christ Chapel allowed the continuation of a working environment in which this type of

activity was allowed to occur and had control over the ability of Mr. Gray to engage in the conduct. In addition, Christ Chapel later ratified the conduct of Mr. Gray by refusing to take effective remedial action and by punishing Ms. Todd because she complained and was the victim.

164.   As a direct and proximate result of Jonathan Gray's and Christ Chapel's actions, Ms. Todd has suffered damages, including past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, physical and emotional stress, pain, suffering, inconvenience, mental anguish, medical expenses, embarrassment, and humiliation.

165.   Due to the severity of the conduct of Jonathan Gray and Christ Chapel, Ms. Todd is entitled to punitive damages.

### COUNT SEVEN –

### BREACH OF FIDUCIARY DUTY
**(against Jonathan Gray and Christ Chapel (Assemblies of God))**

166.   The allegations of the foregoing paragraphs are incorporated as if realleged herein.

167.   As a pastor to whom Ms. Todd had turned for pastoral counseling, Mr. Gray had a close and confidential relationship with Ms. Todd that included a high degree of trust and confidence between them.

168.   Mr. Gray breached that relationship with Ms. Todd by luring her into having sex with him.

169.   Mr. Gray breached his fiduciary duty to Ms. Todd by having sex with her.

170.    Mr. Gray breached his fiduciary duty to Ms. Todd during the course of performing his duties with Christ Chapel, including the duty of providing pastoral counseling to her.

171.    Mr. Gray breached his fiduciary duty to Ms. Todd during the course of executing the services for which he was employed by Christ Chapel, including the service of providing Ms. Todd with the pastoral counseling she requested.

172.    Mr. Gray was acting within the scope of employment at the time he breached his fiduciary duty to Ms. Todd.

173.    Christ Chapel is responsible and liable for Mr. Gray's breach of fiduciary duty under the doctrine of respondeat superior.

174.    Christ Chapel gave Mr. Gray implied authority to engage in this conduct. Christ Chapel allowed the continuation of a working environment in which this type of activity was allowed to occur and had control over the ability of Mr. Gray to engage in the conduct. Moreover, Christ Chapel later ratified the conduct of Mr. Gray by refusing to take effective remedial action and by punishing Ms. Todd because she complained and was the victim.

175.    As a direct and proximate result of Jonathan Gray's and Christ Chapel's actions, Ms. Todd has suffered damages, including past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, physical and emotional stress, pain, suffering, inconvenience, mental anguish, medical expenses, embarrassment, and humiliation.

176.    Due to the severity of the conduct of Jonathan Gray and Christ Chapel, Ms. Todd is entitled to punitive damages.

27

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff TATANA M. TODD requests that this Court enter judgment in her favor and against Defendants CHRIST CHAPEL (ASSEMBLIES OF GOD) on all Counts, and against JONATHAN GRAY on Counts Six and Seven; and further:

a) Award Ms. Todd all financial and compensatory damages, in amounts to be established at trial, on Counts One through Seven; and in addition

b) Award Ms. Todd punitive and exemplary damages, in amounts to be established at trial, on Counts One through Seven; and in addition

c) Award Ms. Todd her attorney's fees and costs in this action as permitted by law, including costs and fees of expert witnesses; and in addition

d) Award Ms. Todd pre- and post-judgment interest on any amounts awarded to her as permitted by law; and in addition

e) Award Ms. Todd such other and further relief as may be appropriate and permitted by law.

## JURY DEMAND

### PLAINTIFF TATANA M. TODD DEMANDS A TRIAL BY JURY.

October 24, 2012

Respectfully submitted,

Peter C. Cohen
Virginia Bar No. 66346
pcohen@cbcblaw.com
CHARLSON BREDEHOFT COHEN
 BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile

*Counsel for Tatana M. Todd*

28